# IN THE SUPREME COURT, STATE OF WYOMING

## 2019 WY 112

### OCTOBER TERM, A.D. 2019

**November 6, 2019**

LEWIS ALAN DUGAN,

Appellant
(Defendant),

v.

THE STATE OF WYOMING,

Appellee
(Plaintiff).

S-18-0296

*Appeal from the District Court of Converse County*
The Honorable F. Scott Peasley, Judge

*Representing Appellant:*

Office of the Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Jonathan W. Foreman, Senior Assistant Public Defender. Argument by Mr. Foreman.

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Benjamin Fischer, Assistant Attorney General. Argument by Mr. Fischer.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*KAUTZ, J., delivers the opinion of the Court; DAVIS, C.J., files a dissenting opinion in which FOX, J., joins.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**KAUTZ, Justice.**

[¶1]   A jury convicted Appellant Lewis Alan Dugan of stalking, in violation of Wyo. Stat. Ann. § 6-2-506(b) and (e)(i) (LexisNexis 2017).  On appeal, Mr. Dugan asserts the statute is unconstitutional as applied to his conduct because it punishes speech protected by the First Amendment to the United States Constitution.  He also claims the district court erred in instructing the jury and refusing to use his requested special verdict form, the evidence was insufficient to show he harassed the victim, and the district court erred by admitting evidence that he had been warned not to send unsolicited letters.

[¶2]   We affirm.

## ISSUES

[¶3]   We have rephrased Mr. Dugan's appellate issues and re-ordered them to facilitate a more structured analysis:

I.      Was Mr. Dugan's right to free speech under the First Amendment to the United States Constitution violated when the State prosecuted him under the criminal stalking statute, § 6-2-506, for sending letters to the victim?

II.     Did the district court abuse its discretion by incorrectly instructing the jury on Mr. Dugan's theory of defense and the definition of obscene and/or by refusing his request for a special verdict form?

III.    Did the State present sufficient evidence to establish Mr. Dugan harassed the victim under the statutory definition in § 6-2-506(a)(ii)?

IV.     Did the district court abuse its discretion by admitting evidence that Mr. Dugan had been warned not to send unsolicited letters?

## FACTS

[¶4]   In January and February 2017, Mr. Dugan sent ten letters to the victim at her workplace in Douglas, Wyoming.  Mr. Dugan was imprisoned at the Wyoming Medium Correctional Institution in Torrington, Wyoming, when he began sending the letters.  He continued to send the victim letters after he was transferred to the Wyoming State Penitentiary in Rawlins, Wyoming, on February 1, 2017.  Mr. Dugan was a friend of the victim's son when they were in school, but the victim had not had a conversation with Mr. Dugan in over twenty years and never asked him to correspond with her.

[¶5]   The letters were generally rambling dissertations on Mr. Dugan's life, with a recurring theme that he wanted a romantic and sexual relationship with the victim.  They

1

contained numerous sexually explicit statements. Mr. Dugan asked the victim to send him "hot sexy pictures" of herself in a bikini or "booty shortz." He asked the victim whether her favorite sexual position was to "get on top and ride," "the guy on you," or "doggie style." He said he liked "the 69er." Mr. Dugan asked whether she was a "moaner" or a "screamer" in bed. He said he could "find her crazy spots[.] [E]very woman has crazy good spots[.]" Mr. Dugan indicated his penis was not "a long one but it's fat and round." He wrote, "I know how to make you have good orgasms or cum really good." Mr. Dugan asked whether she knew about "flavored oil[] like the stuff I'd drip on you then I'd lick it off mmm so sometimes p[eo]pl[e] drip it on your boobs and your cooter then lick it off." He said he wanted to sleep nude and shower with her. Mr. Dugan told her he fantasized about them taking the illegal drug, Ecstasy (which he spelled XTC), and having sex.

[¶6]   Mr. Dugan said he had been "checking [the victim] out" before he went to prison and described seeing the victim going home or to work and the car she drove. His letters also demonstrated he knew he should not be writing to her. He asked her numerous times not to contact law enforcement and not to tell his parents he was writing to her because "they always get on my ass about it."

[¶7]   The victim contacted law enforcement when she started receiving Mr. Dugan's letters. She stated the letters made her feel "sick and nervous and scared." Converse County Sheriff Department Investigator Keri McNare testified the victim was "very upset." Law enforcement officials told Mr. Dugan to stop writing letters to the victim. He did not heed the warnings and continued to send her letters.

[¶8]   Two investigators interviewed Mr. Dugan at the penitentiary on February 13, 2017. He admitted during the interview that he knew the victim did not want his letters, but he continued to send them anyway. After the investigators left, Mr. Dugan sent at least one more letter, begging the victim not to tell law enforcement he was communicating with her. The last letter included a limited apology and did not contain any express sexual statements. However, he did refer to matters from his earlier letters that were related to his sexual desires, including requests that she send him pictures and a plea for a relationship with her.

[¶9]   The State charged Mr. Dugan with felony stalking of the victim in violation of § 6-2-506(b) and (e)(i). He pleaded not guilty, and the case proceeded to trial in March 2018. The jury found Mr. Dugan guilty, and the district court sentenced him to prison for four to seven years, to be served concurrent with another sentence. This appeal followed.

## DISCUSSION

## I.     First Amendment

[¶10]  Mr. Dugan claims the State violated his rights under the First Amendment to the United States Constitution by prosecuting him under § 6-2-506(a)(ii) for his protected speech.[1]  A court's determination of whether a statute is constitutional on its face or as applied to a defendant is a matter of law, subject to *de novo* review.[2]  *Sanderson v. State,* 2007 WY 127, ¶ 31, 165 P.3d 83, 92 (Wyo. 2007).

### A.    *The Stalking Statute – Section 6-2-506 (2017)*

[¶11]  The relevant portions of § 6-2-506 (2017)[3] provided:

> (a) As used in this section:
>
> (i) "Course of conduct" means a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose;
>
> (ii) "Harass" means to engage in a course of conduct, including but not limited to verbal threats, written threats, lewd or obscene statements or images, vandalism or nonconsensual physical contact, directed at a specific person or the family of a specific person, which the defendant knew or should have known would cause a reasonable person to suffer substantial emotional distress, and which does in fact seriously alarm the person toward whom it is directed.
>
> (b) Unless otherwise provided by law, a person commits the crime of stalking if, with intent to harass another person, the person engages in a course of conduct reasonably likely to harass that person, including but not limited to any combination of the following:
>
> (i)    Communicating, anonymously or otherwise, or causing a communication with another person by verbal,

---

[1] Mr. Dugan does not argue the comparable provision of the Wyoming Constitution provides additional protection.  Wyo. Const. art. 1 § 20 ("Every person may freely speak . . . on all subjects, being responsible for the abuse of that right[.]").

[2] Mr. Dugan presents his constitutional challenge by claiming the district court erred in denying his motion for a judgment of acquittal.  Regardless of how the issue is framed, the parties agree Mr. Dugan's constitutional claim involves a question of law which we review *de novo*.

[3] The statute was amended in 2018.  2018 Wyo. Sess. Laws, ch. 63, § 1, ch. 97, § 1.  The amendment does not affect this action because it was commenced in 2017.  Wyo. Stat. Ann. § 8-1-107 (LexisNexis 2019); *Counts v. State,* 2014 WY 151, ¶ 19, 338 P.3d 902, 907 (Wyo. 2014) (statutory amendments generally apply prospectively and do not affect pending actions unless the legislature expressly provides otherwise).

electronic, mechanical, telegraphic, telephonic or written means in a manner that harasses;

. . .

(e) A person convicted of stalking under subsection (b) of this section is guilty of felony stalking punishable by imprisonment for not more than ten (10) years, if:

(i) The act or acts leading to the conviction occurred within five (5) years of a prior conviction under this subsection, or under subsection (b) of this section, or under a substantially similar law of another jurisdiction[.]

## B.  *General First Amendment Law*

[¶12]  The First Amendment to the United States Constitution states in relevant part: "Congress shall make no law . . . abridging the freedom of speech." ""[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *United States v. Stevens,* 559 U.S. 460, 468, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (quoting *Ashcroft v. American Civil Liberties Union,* 535 U.S. 564, 573, 122 S.Ct. 1700, 1707, 152 L.Ed.2d 771 (2002)) (other citations omitted).  The First Amendment is applicable to the states through the Fourteenth Amendment to the United States Constitution. *Mekss v. Wyo. Girls' School,* 813 P.2d 185, 192-93 (Wyo. 1991).

[¶13]  A litigant may assert a statute violates his right to free speech through a facial challenge or an as-applied challenge.  "A statute is unconstitutional on its face if it prohibits a substantial amount of protected expression.  If a statute is facially overbroad in violation of the First Amendment[,] it cannot be enforced in any part." *Rutti v. State,* 2004 WY 133, ¶ 11, 100 P.3d 394, 401 (Wyo. 2004) (citing *Ashcroft,* 535 U.S. at 244, 122 S.Ct. at 1398-99) (other citations omitted).  An as-applied challenge, on the other hand, considers the "statute in light of the charged conduct." *United States v. Franklin-El,* 554 F.3d 903, 910 (10th Cir. 2009) (citing *United States v. LaHue,* 261 F.3d 993, 1005 (10th Cir. 2001)); *Martinez v. City of Rio Rancho,* 197 F.Supp.3d 1294, 1309 (D. N.M. 2016).  *See also*, *Dougherty v. State,* 2010 WY 127, ¶¶ 7, 15, 239 P.3d 1176, 1179, 1181 (Wyo. 2010) (using the same as-applied standard for a due process vagueness claim); *Rabuck v. State,* 2006 WY 25, ¶ 16, 129 P.3d 861, 865 (Wyo. 2006) (same).  "If an as-applied challenge to the constitutionality of a statute is successful, the statute may not be applied to the challenger but is otherwise enforceable."  16 C.J.S. *Const. Law* § 243 (2019).

## C.  *Section 6-2-506 is Constitutional on its Face*

[¶14] Mr. Dugan acknowledges this Court ruled the stalking statute is constitutional on its face in *Luplow v. State,* 897 P.2d 463 (Wyo. 1995). We said § 6-2-506 is not overbroad because it does not reach a substantial amount of protected speech. *Id.* at 467-68. *See also, Garton v. State,* 910 P.2d 1348, 1351 (Wyo. 1996). "It is true it may inhibit speech, but only in a constitutionally permissible way." *Luplow,* 897 P.2d at 467. While Mr. Dugan does not make an overt facial challenge, his argument blurs the boundary between a facial challenge and an as-applied challenge. In order to properly address his arguments, it is necessary to review some aspects of the law regarding the facial constitutionality of the statute.

[¶15] The general rule is:

> The First Amendment guaranty of free speech does not preclude punishment for criminal stalking. A criminal defendant's right to free speech is permissibly subordinated to a victim's right to be free of repetitive unwanted verbal and nonverbal communications likely to instill a reasonable fear of harm. A criminal stalking statute is valid if not overbroad, regulating conduct and not speech.

16B C.J.S. *Const. Law* § 1127 (2019).

[¶16] Properly crafted harassment or stalking statutes do not punish the simple act of communicating statements; they punish repeated communications done with an unlawful intent to harm another person. By incorporating some or all of the following elements into the statutory language, a legislature may limit the statute's reach to avoid a substantial impact upon protected speech: the defendant act with specific criminal intent; the defendant make repeated communications to the victim; the communications cause the victim to suffer a significant or substantial negative reaction; the victim's reaction is objectively reasonable; and political speech is expressly excluded from the statute's reach. *See, e.g.*, *United States v. Osinger,* 753 F.3d 939, 943-44 (9th Cir. 2014) (upholding a federal statute that stated, "Whoever . . . (2) with the intent . . . to kill, injure, harass, . . . or intimidate [a person] . . . uses the mail, any interactive computer service, or any facility of interstate or foreign commerce to engage in a course of conduct that causes substantial emotional distress to that person shall be punished[.]"); *United States v. Petrovic,* 701 F.3d 849, 856 (8th Cir. 2012) (same); *Thorne v. Bailey,* 846 F.2d 241 (4th Cir. 1988) (upholding West Virginia's harassment statute which prohibited calls made with the specific intent to harass); *People v. Taravella,* 350 N.W.2d 780 (Mich. Ct. App. 1984) (upholding a Michigan statute which prohibited telephone communications made with the intent to harass); *State v. Camp,* 295 S.E.2d 766 (N.C. Ct. App. 1982) (upholding a North Carolina statute which prohibited repeated telephone calls made with the purpose of harassing another); *State v. Elder,* 382 So.2d 687 (Fla. 1980) (upholding a Florida statute prohibiting anonymous phone calls made with the intent to harass). *Compare, Matter of Welfare of*

5

*A.J.B.,* 929 N.W.2d 840, 854-55 (Minn. 2019) (declaring Minnesota stalking by mail statute unconstitutional because it did not include elements requiring proof of a specific criminal intent or substantial harm to the victim).

[¶17] By including these requirements, the legislature criminalizes conduct without reaching a substantial amount of protected speech. 16B C.J.S. *Const. Law* § 1127. In other words, "the proscribed acts are tethered to the underlying criminal conduct and not to speech." *Osinger,* 753 F.3d at 944. The United States Supreme Court in *Cox v. Louisiana,* 379 U.S. 536, 555, 85 S.Ct. 453, 465, 13 L.Ed.2d 471 (1965) (internal quotations and citation omitted), expressed the concept in a more general way: "[I]t has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

[¶18] Section 6-2-506 bears all the hallmarks of a statute that criminalizes conduct without reaching a substantial amount of protected speech. It requires proof that the defendant acted with the specific intent to harass the victim. Section 6-2-506(b); *Dean v. State,* 2014 WY 158, ¶ 10, 339 P.3d 509, 512 (Wyo. 2014); *Luplow,* 897 P.2d at 468. Section 6-2-506 (a)(ii) and (b) incorporate the concept of repeated communications to the victim by requiring the State to prove the defendant engaged in a "course of conduct." *Id.* "Course of conduct" is defined as "a pattern of conduct composed of a series of acts over any period of time evidencing a continuity of purpose." Section 6-2-506(a)(i). *See also, Hawes v. State,* 2014 WY 127, ¶¶ 9-11, 335 P.3d 1073, 1076-77 (Wyo. 2014) (insufficient evidence of "course of conduct" element of § 6-2-506). The definition of "harass" in § 6-2-506(a)(ii) requires proof the defendant knew or should have known his conduct "would cause a reasonable person to suffer substantial emotional distress, and which does in fact seriously alarm the person toward whom it is directed." *See generally*, *Veile v. Martinson,* 258 F.3d 1180, 1189-90 (10th Cir. 2001) (sufficient evidence that victim was seriously alarmed as a result of Mr. Veile's statements that he would "ruin" the victim's business and reputation and the victim's religion was a cult and other harassing conduct). Section 6-2-506(c) carves out political speech from the statute's coverage: "This section does not apply to an otherwise lawful demonstration, assembly or picketing."

[¶19] Despite his recognition of our decision in *Luplow* and his claim to be raising only an as-applied challenge to the statute*,* Mr. Dugan puts forth arguments which are principally challenges to the facial constitutionality of § 6-2-506. He asserts our statute is "in all essential elements" the same as the statute the Illinois Supreme Court declared unconstitutional on its face in *People v. Relerford,* 104 N.E.3d 341 (Ill. 2017). Mr. Dugan is incorrect. The Illinois statute was broader than § 6-2-506.

[¶20] The Illinois court ruled the statute reached a substantial amount of protected speech, in part, because it did not require proof that the defendant acted with a specific criminal intent. Instead, it imposed criminal liability for negligent conduct. *Relerford,* 104 N.E.3d

at 352-53, 356.  The court noted that the absence of a specific intent element distinguished the Illinois statute from the federal stalking statute considered in *Osinger* and *Petrovic*.[4] *Id.* at 352.  Because it was critical to the Illinois court's decision that the statute did not require a specific criminal intent, *Relerford* is consistent with authorities distinguishing criminal conduct from protected speech.  *Relerford* does not, therefore, support Mr. Dugan's claim that § 6-2-506 violates the First Amendment guaranty of freedom of speech.

[¶21]  Mr. Dugan also asserts that because § 6-2-506 singles out communication that is lewd or obscene,[5] it is a content-based regulation of speech, subject to strict scrutiny.  A means-end analysis like strict scrutiny is appropriate only when a statute infringes on a substantial amount of protected speech.  R. Galloway, *Basic Free Speech Analysis,* 31 Santa Clara L. Rev. 883, 886 (1991).  If a statute infringes on free speech, a court must determine if the government

> complied with the rules the Supreme Court has developed for enforcing that freedom. These rules often take the form of means-end scrutiny, a mode of legal analysis that focuses on the government interests (ends), the effectiveness of the method (means) chosen to further those interests, and the availability of less restrictive alternative means. Some infringements, including most content-based infringements, are subject to strict scrutiny. Some, including most content-neutral infringements, are subject to mid-level means-end scrutiny.

*Id*.  Strict scrutiny "requires the establishment of [a] compelling state interest and the showing that the method of achieving [the interest] is the least intrusive of those methods by which such can be accomplished." *In re RM,* 2004 WY 162, ¶ 13, 102 P.3d 868, 873 (Wyo. 2004) (internal quotations and citation omitted).  Mid-level or intermediate scrutiny requires the establishment of a significant governmental interest and the showing that the method of achieving the interest is narrowly tailored to serve that purpose.  *See Clark v.*

---

[4] *Relerford,* 104 N.E.3d at 353, also noted the statute did not criminalize the "historic and traditional categories of unprotected speech," which include threats, speech integral to a crime, fighting words, obscenity, child pornography, and commercial speech that is misleading or concerned only with illegal activity.  *Id.*; R. Galloway, *Basic Free Speech Analysis,* 31 Santa Clara L. Rev. 883, 893-94 (1991).

[5] Although neither party points it out, the stalking statute at the time *Luplow* was decided did not include "lewd or obscene statements or images" in the definition of harass.  *Luplow,* 897 P.2d at 465.  That language was added in 2007.  2007 Wyo. Sess. Laws, ch. 161 §§ 1-2.  *Garton,* 910 P.2d at 1351, was also decided before the statute was amended.  Even though the statute did not include a specific reference to lewd or obscene statements, we concluded Mr. Garton's First Amendment rights were not violated when he was prosecuted under § 6-2-506(b)(i) for making lewd and obscene telephone calls and mailing items suggesting lewd and lascivious acts.  *Id.* at 1351.

*Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984).

[¶22]  The fact that § 6-2-506 identifies "lewd or obscene statements" in the definition of harass does not make it a content-based regulation on speech rather than a regulation of conduct without a significant impact on protected speech. *People v. Kucharski,* 987 N.E.2d 906 (Ill. Ct. App. 2013), addressed a claim that an Illinois statute, which prohibited obscene communications made with the specific intent to offend, unconstitutionally regulated speech based upon its content.  The court concluded the statute was constitutional because it controlled conduct, not a substantial amount of protected speech. *Id.* at 914.  Obscene communications made with criminal intent are restricted "not because its content communicates any particular idea . . . [but] because of the purpose for which it is communicated." *Id. See also, Perkins v. Commonwealth*, 402 S.E.2d 229, 232-33 (Va. Ct. App. 1991) (statute which prohibited the use of "obscene, vulgar, profane, lewd, lascivious, or indecent language" with the specific intent to "coerce, intimidate or harass" regulated conduct not a particular category of speech); *State v. Richards*, 896 P.2d 357, 361-63 (Idaho Ct. App. 1995) (statute prohibiting telephoning another "with the intent to annoy, terrify, threaten, intimidate, harass or offend" and communicating "to or about such person any obscene, lewd or profane language, or mak[ing] any request, suggestion or proposal which is obscene, lewd, lascivious or indecent" regulates conduct, not protected speech); *State v. Dugan*, 303 P.3d 755, 769-72 (Mont. 2013) (after invalidating a provision that created a presumption of intent, the Montana Supreme Court upheld a statute that criminalized communication using obscene, lewd or profane language or suggesting a lewd or lascivious act made with the specific purpose of terrifying, intimidating, threatening, harassing, annoying, or offending the victim).  We, therefore, reaffirm our holdings in *Luplow* and its progeny that § 6-2-506 is constitutional on its face.

### D. *Section 6-2-506 is Constitutional As-Applied to Mr. Dugan*

[¶23]  Mr. Dugan claims § 6-2-506 is unconstitutional as applied to him.  When assessing whether a statute is unconstitutional as applied to a defendant, we consider the statute in light of his specific conduct. *Franklin-El,* 554 F.3d at 910; *Dougherty*, ¶¶ 7, 15, 239 P.3d at 1179, 1181.  We review an as-applied challenge "solely in light of the State's evidence of [Mr. Dugan's] conduct, giving it the benefit of every favorable factual inference that may fairly be drawn from the record." *Guilford v. State,* 2015 WY 147, ¶ 17, 362 P.3d 1015, 1018 (Wyo. 2015).

[¶24]  The evidence showed Mr. Dugan engaged in a course of conduct by sending a series of letters to the victim which contained explicit descriptions of sex acts he wanted to perform with the victim.  Mr. Dugan knew his letters were unwanted and improper.  Law enforcement warned Mr. Dugan to stop writing to the victim, but he continued to do so.  This evidence showed he had a specific intent to harass and knew or should have known his letters would cause a reasonable person to suffer substantial emotional distress.  The

8

evidence also showed the victim found the letters seriously alarming. She stated she felt "sick to her stomach," "nervous and scared." Investigator McNare testified she observed the victim to be "very upset" about the letters. The State, therefore, demonstrated that Mr. Dugan's communications with the victim amounted to illegal harassing conduct rather than constitutionally protected speech.

[¶25] Mr. Dugan argues the State encouraged the jury to convict him based solely upon the content of his speech by unduly emphasizing the sexually explicit aspects of his statements in its presentation of the evidence and arguments to the jury. As we explained above, the State can lawfully regulate obscene statements under a statute that prohibits illegal harassment. The evidence that Mr. Dugan's statements were obscene pertained to the harassment element of the crime, which the State was required to prove. Presenting and arguing evidence of the crime to the jury was not only appropriate, it was required under the terms of the statute.

[¶26] Nevertheless, Mr. Dugan argues that the State's inappropriate attempt to prosecute him solely on the basis of his speech is demonstrated by some of the witnesses' answers to a series of questions about other topics. During cross-examination, defense counsel asked Investigator McNare:

> Q.     . . . These may be dumb questions; you'll have to excuse me. But if Mr. Dugan wrote a letter to [the victim] that said, single line, "Puppies are cute," and then enclosed a picture of a cute puppy. Is that something you would refer for prosecution?
>
> A.     No.
>
> Q.     What if he wrote a letter saying[,] "I . . . really love the Denver Broncos. Yay, Denver Broncos. John Elway is the greatest," would you refer that for prosecution?
>
> A.     Are you asking like after I told him no or . . .?
>
> Q.     Yeah. At any time.
>
> A.     At this point if he was [to] continue after told no, yes.
>
> Q.     Okay. What if he wrote a letter, one letter saying that he thinks the greatest city in the world is Tulsa, Oklahoma, and he writes for pages extolling the virtues of the good people of Tulsa, Oklahoma. Would that be something you would want to refer for prosecution?

> A.     Again, if he's told to stop contacting [the victim] and he wrote that letter to [the victim], yes.
>
> Q.     Would any of those above letters contain any threats?
>
> A.     The ones that you just talked about?
>
> Q.     Yeah. My scenarios.
>
> A.     No, those are not.
>
> Q.     Okay. Do they contain anything that would be obscene?
>
> A.     No.

Defense counsel also asked the victim questions about whether she would have been offended by letters from Mr. Dugan about the same subjects – puppies, the Denver Broncos, and Tulsa, Oklahoma. Each time, she responded, "No."

[¶27]  Mr. Dugan's argument that this line of questioning shows he was prosecuted only for his speech ignores that § 6-2-506 requires more than proof that he made obscene statements. Although a letter or letters about puppies, the Broncos, or Tulsa would not have resulted in prosecution for criminal stalking, it does not follow that the only attribute of Mr. Dugan's conduct which resulted in prosecution was his use of obscene statements. His course of conduct (writing extensive and repeated letters) was an essential element of the crime as defined by § 6-2-506. Investigator McNare referenced other elements of § 6-2-506 when she mentioned that warnings to cease communication would be important to her decision on whether to refer a matter for prosecution. The State was also required to show Mr. Dugan knew or should have known his conduct would cause a reasonable person to suffer substantial emotional distress and the victim was, in fact, seriously alarmed. The victim said communications from Mr. Dugan about puppies, the Denver Broncos, and Tulsa would not have caused her such distress. Given that the State was required to prove all the elements of § 6-2-506, Mr. Dugan was not prosecuted simply for making obscene statements.

[¶28]  In making his "as-applied" argument, Mr. Dugan also relates his situation to *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Mr. Cohen was convicted under a California statute for maliciously and willfully disturbing the peace or quiet of a neighborhood or person by offensive conduct for wearing a jacket in a state courthouse which bore the words "F\*\*K the Draft." *Id.* at 16, 91 S.Ct. at 1784. The United States Supreme Court overturned his conviction, concluding the statute, as applied to Cohen, was unconstitutional because it punished him for his protected speech, not his

10

conduct. "The only conduct which the [prosecution] sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely upon speech[.]" *Id.* at 18, 91 S.Ct. at 1784 (internal quotations and citations omitted). The state could not, consistent with the First Amendment, make his simple public display of an expletive a crime. *Id.* at 26, 91 S.Ct. at 1789.

[¶29] Mr. Dugan's situation is obviously distinguishable from *Cohen.* The Supreme Court in *Cohen* found it significant that the defendant's statement was not directed at a specific person. *Cohen,* 403 U.S. at 20-21, 91 S.Ct. at 1785-86. That is not the case here; Mr. Dugan directed his letters to the victim. Unlike in the present case, the statute in *Cohen* did not require repeated actions and there was no indication the defendant engaged in a course of conduct. The California statute also did not require proof that Cohen knew or should have known his conduct would cause substantial emotional distress to a reasonable person or that a person actually suffer serious alarm. Furthermore, the idea expressed by Cohen was political in nature, a singularly important type of speech protected by the First Amendment. *Id.* at 24-26, 91 S.Ct. at 1787-89. Mr. Dugan's statements had no political value whatsoever.

[¶30] Mr. Dugan also argues § 6-2-506 is unconstitutional as applied to him because his statements were not obscene under Wyo. Stat. Ann. § 6-4-301(a)(iii) (LexisNexis 2019):

>    (a) As used in this article:
>
>    . . . .
>
>    (iii) "Obscene" is material which the average person would find:
>
>        (A) Applying contemporary community standards, taken as a whole, appeals to the prurient interest;
>
>        (B) Applying contemporary community standards, depicts or describes sexual conduct in a patently offensive way; and
>
>        (C) Taken as a whole, lacks serious literary, artistic, political or scientific value.

[¶31] This definition applies to the crimes in Title 6, Article 3 of the Wyoming Statutes which generally addresses the dissemination of obscene materials. Section 6-2-506 does not incorporate the § 6-4-301 definition of obscene, nor does it otherwise define the term. Under standard rules of statutory construction, we are not at liberty to add words to a statute that the legislature chose to omit. *Wyodak Res. Dev. Corp. v. Dep't of Rev.,* 2017

WY 6, ¶ 31, 387 P.3d 725, 733 (Wyo. 2017) (citing *MF v. State,* 2013 WY 104, ¶ 11, 308 P.3d 854, 858 (Wyo. 2013)).  When a statute does not provide a technical definition of a word, the ordinary definition of the word generally applies.  *Cecil v. State,* 2015 WY 158, ¶ 14, 364 P.3d 1086, 1090-91 (Wyo. 2015).

[¶32]  Section 6-4-301(a)(iii) mirrors the United States Supreme Court's definition of obscene which is applicable to statutes regulating pure speech.  *See, e.g.*, *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).  In *State v. Crelly,* 313 N.W.2d 455 (S.D. 1981), the South Dakota Supreme Court considered a statute which prohibited calling "another person with intent to terrorize, intimidate, threaten, harass, or annoy such person by using any obscene or lewd language or by suggesting any lewd or lascivious act(.)"  *Id.* at 455.  The South Dakota court firmly rejected an argument that the definition of "obscene" from United States Supreme Court cases like *Miller* should apply to the harassment statute.  *Id.* at 455-56.  *Crelly,* 313 N.W.2d at 456 (quoting *Baker v. State,* 494 P.2d 68, 70-71 (Ariz. Ct. App. 1972)) ("It would be . . .  inane to interpret the word "obscene" in the context of the [United States Supreme Court obscenity] standards when dealing with obscene phone calls.").  *Crelly* held that the ordinary meaning of obscene applied to South Dakota's obscene phone calls statute.  *Id.* at 456.  *See also*, *People v. Hernandez,* 283 Cal. Rptr. 81, 85 (Cal. Ct. App. 1991) (refusing to apply *Miller* definition of obscene to telephone harassment statute); *State v. Kipf,* 450 N.W.2d 397, 404-05 (Neb. 1990) (same).  We agree with this rationale.

[¶33]  The punishment of obscenity under laws that regulate pure speech is much different than the punishment of harassing conduct which includes obscene statements.  The ordinary meaning of "obscene," i.e., "'[e]xtremely offensive under contemporary community standards of morality and decency; grossly repugnant to the generally accepted notions of what is appropriate,'" *Dougherty,* ¶ 12, 239 P.3d at 1181 (quoting *Black's Law Dictionary* 1182 (9th ed. 2009)), applies to § 6-2-506.  The district court's refusal to require proof that Mr. Dugan's statements met the definition of "obscene" under § 6-4-301 and the *Miller* standard does not render § 6-2-506 unconstitutional as applied to him.

## II.    Jury Instructions and Verdict Form

[¶34]  Mr. Dugan claims the district court abused its discretion by improperly instructing the jury on his theory of defense and refusing his jury instruction defining "obscene."  He also maintains the district court erred by refusing to use his special verdict form which would have required the jury to choose whether Mr. Dugan's letters contained obscene statements or threats.  In general,

> [w]e review a district court's decision regarding jury instructions for an abuse of discretion.  The district courts are afforded substantial latitude to tailor jury

12

instructions to the facts of the case. So long as the jury instructions correctly state the law and adequately cover the issues presented in the trial, reversible error will not be found.

*Birch v. State,* 2018 WY 73, ¶ 12, 421 P.3d 528, 533 (Wyo. 2018) (quotation marks and citations omitted). However, "[t]he failure to give an instruction on the law related to a theory of defense is a due process issue, which this Court reviews *de novo.*" *James v. State,* 2015 WY 83, ¶ 17, 357 P.3d 101, 105 (Wyo. 2015) (citing *Nelson v. State,* 2010 WY 159, ¶ 13, 245 P.3d 282, 285 (Wyo. 2010)).

### A. *Theory of Defense*

[¶35] Mr. Dugan proposed the following theory of defense instruction:

> The defendant asserts that he is being criminally prosecuted due to the contents of the letters that he wrote to [the victim], which is an attempt to criminally sanction his speech. Under the First Amendment to the United States Constitution, the State may not punish the defendant for the content of his speech unless it can prove beyond a reasonable doubt that the speech falls under a previously recognized exception to the First Amendment of the United States Constitution. Those exceptions are:
>
> > Incitement to Imminent Violence,
> > Libel,
> > Obscenity,
> > Child Pornography,
> > Fighting Words,
> > Furtherance of Another Crime, or
> > Copyright/Trademark.
>
> To criminally sanction the defendant for the contents of his letters, the State must prove beyond a reasonable doubt that [the d]efendant's letters fit into one of the above exceptions.
>
> If you are unable to unanimously find that the defendant's letters fit into an exception mandated by the First Amendment, then you must acquit the defendant.

[¶36] The district court declined to give Mr. Dugan's proposed instruction because it misstated the law. Although "[d]ue process requires the trial court to give a correct

13

instruction to the jury that details the defendant's theory of the case," the instruction must present a defense recognized by statute or case law in this jurisdiction. *James*, ¶ 18, 357 P.3d at 105 (citation omitted).

[¶37]   As we explained in Paragraph 20, footnote 4, certain categories of speech are outside the protection of the First Amendment, including threats, criminal speech, fighting words, obscenity, child pornography, and commercial speech that is misleading or only concerned with illegal activity. *Basic Free Speech Analysis,* 31 Santa Clara L. Rev. at 893-94.  Mr. Dugan's proposed instruction stated the State had to prove his speech fell within one of the listed categories of unprotected speech to convict him of criminal stalking.  However, § 6-2-506 complies with the First Amendment because it punishes conduct, not a substantial amount of protected speech.  The district court correctly rejected Mr. Dugan's proposed instruction because it did not state a proper defense to the stalking charge.

[¶38]   Before we leave this issue, we want to briefly comment on the theory of defense instruction that was given by the district court:

**INSTRUCTION NO. 15**

The Defendant denies that his conduct or letters constituted harassment.  Therefore, the Defendant asserts that he should not be criminally prosecuted for Stalking because he has First Amendment protection under the Constitution.

[¶39]   Some First Amendment questions are factual in nature and should be submitted to the jury for decision.  *See, e.g.*, *United States v. Viefhaus,* 168 F.3d 392, 397 (10ᵗʰ Cir. 1999) (questions as to whether a statement is a true threat or political speech are for the jury).  However, legal questions regarding whether a statute or prosecution under a statute is constitutional under the First Amendment are properly reserved to the court.  *Dennis v. United States,* 341 U.S. 494, 513, 71 S.Ct. 857, 869, 95 L.Ed. 1137 (1951) (Vinson, C.J. joined by Reed, Burton, and Minton, JJ.).  *See also*, *Powell v. State,* 12 P.3d 1187, 1191 (Alaska Ct. App. 2000) (while the jury decides factual issues implicating the First Amendment, the court decides as a matter of law whether the First Amendment protects the defendant from criminal prosecution).  This is a simple application of the general rule that the jury resolves factual issues and the court decides questions of law.  *Widdison v. State,* 2018 WY 18, ¶ 21, 410 P.3d 1205, 1213 (Wyo. 2018); *Snow v. State,* 2009 WY 117, ¶¶ 29-30, 216 P.3d 505, 514 (Wyo. 2009).

[¶40]   As demonstrated in our discussion of the constitutional issue, the application of the First Amendment in this case involves complex legal questions.  The district court should not have given Instruction No. 15 as the theory of defense instruction because it placed the jury in the difficult and improper position of having to decide the legal issue of whether Mr. Dugan's actions were entitled to First Amendment protection.  However, Mr. Dugan's

only challenge to the instruction is that it did not include information about the categories of speech that are not protected by the Constitution, which is not a proper defense to the stalking charge. Consequently, we will not further address the instruction given by the district court.

## B. *Definition of Obscene*

[¶41] Mr. Dugan argues the district court abused its discretion by refusing to give a jury instruction defining "obscene" in accordance with *Miller,* 413 U.S. at 24, 93 S.Ct. at 2615-16 and § 6-4-301(a)(iii). The district court denied Mr. Dugan's requested instruction and decided no instruction defining the term "obscene" was necessary because the ordinary and usual meaning applied, citing Wyo. Stat. Ann. § 8-1-103(a)(i) (LexisNexis 2019) ("The construction of all statutes of this state shall be by the following rules, unless that construction is plainly contrary to the intent of the legislature: . . . Words and phrases shall be taken in their ordinary and usual sense[.]") As we explained in our discussion of the constitutional issue, the definition of "obscene" for statutes that punish pure speech does not apply to criminal stalking. Instead, the word should be given its ordinary meaning. Mr. Dugan does not argue that the district court should have given an instruction defining obscene in its ordinary sense. Furthermore, a trial court generally "is under no obligation to define a statutory term unless the term carries a technical connotation different from its everyday meaning." *Ewing v. State,* 2007 WY 78, ¶ 9, 157 P.3d 943, 945-46 (Wyo. 2007). *See also*, *Montez v. State,* 2009 WY 17, ¶ 22, 201 P.3d 434, 441 (Wyo. 2009) (citing *Schmidt v. State,* 2001 WY 73, ¶ 24, 29 P.3d 76, 83 (Wyo. 2001)). The district court did not abuse its discretion by refusing to give the defense's requested instruction on the definition of obscene.

## C. *Special Verdict Form*

[¶42] The general verdict form used by the district court directed the jury to decide whether Mr. Dugan was guilty or not guilty of "[s]talking as charged," and it found him guilty. Mr. Dugan claims the district court should have used his proposed verdict form which included a special interrogatory:

### COUNT I

We the jury, duly empaneled and sworn to try the above entitled cause, do find that as to the first count of Stalking charged in the Information, the Defendant, Lewis Dugan, is:

_____    Guilty

_____    Not Guilty

15

## SPECIAL INTERROGATORY

Please answer 1(a) below if the jury is able to unanimously agree to a verdict:

1(a)  Did Lewis Dugan:

\_\_\_\_\_ write letters that were obscene to [the victim]?

\_\_\_\_\_ write letters that threatened imminent violence to be inflicted upon [the victim]?

\_\_\_\_\_ neither write letters that were as a whole obscene to [the victim], nor threatened imminent violence to be inflicted upon [the victim]?

[¶43]  Mr. Dugan asserts the district court was obligated under *Tanner v. State,* 2002 WY 170, 57 P.3d 1242 (Wyo. 2002), to give his special interrogatory which instructed the jury to choose whether his letters to the victim contained threats or obscene statements.  He argues further that, because the jury did not choose between the two theories, the State must show there was sufficient evidence of both theories to uphold his conviction.

[¶44]  Tanner was charged with burglary under Wyo. Stat. Ann. § 6-3-301: "(a) A person is guilty of burglary if, without authority, he enters or remains in a building . . . with intent to commit larceny or a felony therein."  *Tanner, ¶* 7 n.3, 57 P.3d at 1244 n.3.  Intent to commit larceny and intent to commit a felony are different elements of burglary.  *Jordin v. State,* 2018 WY 64, ¶¶ 11-12, 419 P.3d 527, 531 (Wyo. 2018) (discussing *Tanner,* ¶¶ 9-14, 57 P.3d at 1244-47).  The jury in *Tanner* was informed that the burglary statute required the State to prove the defendant entered the building with the intent to commit a felony *or* the crime of larceny, without being asked to delineate which element it chose.  *Tanner*, ¶ 9, 57 P.3d at 1245; *Jordin,* ¶ 11, 419 P.3d at 531.  Therefore, Tanner's conviction could not be sustained unless there was sufficient evidence of both elements.  *Tanner, ¶* 13, 57 P.3d at 1246.

[¶45]  "Since *Tanner*, this Court has made it clear this rule is limited to situations where the jury is presented with alternative *elements*" of a crime.  *Jordin,* ¶ 12, 419 P.3d at 531 (emphasis in original).  The rule does not apply when a statute provides different means of committing the same element.  *Id.*  For example, in *Miller v. State*, 2006 WY 17, 127 P.3d 793 (Wyo. 2006), the district court instructed the jury that the element of "delivery" of a controlled substance could be proven by evidence of an "actual, constructive, or attempted transfer from one person to another of a controlled substance."  *Id.*, ¶ 23, 127 P.3d at 799.  "Regardless of which type of delivery occurred, the element of the crime—'delivery'—

16

never changed, and thus the jury was not presented with alternative elements upon which the conviction could be based." *Jordin,* ¶ 12, 419 P.3d at 531 (discussing *Miller,* ¶ 23, 127 P.3d at 799). Similarly, in *Brown v. State,* 2014 WY 104, ¶ 9, 332 P.3d 1168, 1172 (Wyo. 2014), the appellant argued that, under the rationale of *Tanner,* the district court should have required the jury to unanimously agree on an alternative within the statutory definition of serious bodily injury, i.e., "miscarriage, severe disfigurement or protracted loss or impairment of the function of any bodily member or organ," to convict him of aggravated assault and battery under Wyo. Stat. Ann. §§ 6-2-502(a)(i) and 6-1-104(a)(x). Failing that, Brown maintained the State had to demonstrate that sufficient evidence existed to convict him on all the alternatives. *Id.* We rejected his claim on both fronts. *Id.,* ¶ 12, 332 P.3d at 1172-73. The *Tanner* rule did not apply because the alternatives were just different means of committing the same element – serious bodily injury. *Id.*

[¶46] Under § 6-2-506(a)(ii), threats and lewd or obscene statements are different means of committing a single element – harassment. Therefore, the district court did not abuse its discretion by refusing Mr. Dugan's proposed special verdict form. Furthermore, the State is not required to show sufficient evidence of both threats and lewd or obscene statements. Sufficient evidence of one of the alternatives is all that is required.

## III. Sufficiency of the Evidence

[¶47] Mr. Dugan asserts the trial evidence was insufficient to establish he harassed the victim under § 6-2-506 because his writings contained neither "threats" nor "lewd or obscene statements."[6] When reviewing a claim that the evidence was insufficient to support a jury's verdict,

> [w]e do not consider whether or not the evidence was sufficient to establish guilt beyond a reasonable doubt[;] [instead, we consider] whether or not the evidence could reasonably support such a finding by the factfinder. We will not reweigh the evidence nor will we re-examine the credibility of the witnesses. We review the sufficiency of the evidence from this perspective because we defer to the jury as the fact-finder and assume [it] believed only the evidence adverse to the defendant since [it] found the defendant guilty beyond a reasonable doubt.

---

[6] Mr. Dugan also presents a vague argument about the meaning of the phrase "including but not limited to" in the statutory definition of harass. i.e., "[h]arass" means to engage in a course of conduct, *including but not limited to* verbal threats, written threats, lewd or obscene statements or images, vandalism or nonconsensual physical contact . . ." Section 6-2-506(a)(ii) (emphasis added). However, he does not claim the district court erred by including that language in the jury instructions or the jury somehow improperly relied upon that phrase to convict him.

*Thompson v. State,* 2018 WY 3, ¶ 14, 408 P.3d 756, 760 (Wyo. 2018) (quoting *Mraz v. State,* 2016 WY 85, ¶ 19, 378 P.3d 280, 286 (Wyo. 2016)) (other citations omitted).

> [T]his Court examines the evidence in the light most favorable to the State. We accept all evidence favorable to the State as true and give the State's evidence every favorable inference which can reasonably and fairly be drawn from it. We also disregard any evidence favorable to the appellant that conflicts with the State's evidence.

*Id.* (quoting *Worley v. State,* 2017 WY 3, ¶ 17, 386 P.3d 765, 771 (Wyo. 2017)) (other citations omitted).

[¶48]  Mr. Dugan expends a great deal of effort attempting to show his statements did not amount to threats, but then just declares his letters were not obscene under *Miller,* 413 U.S. at 24, 93 S.Ct. at 2615, and similar cases.  We have already determined the ordinary meaning of obscene, not the *Miller* definition, applies to § 6-2-506.  Given Mr. Dugan fails to present any argument that his statements were not obscene under the ordinary meaning of the term, he has failed to establish there was insufficient evidence for the jury to conclude he harassed the victim by directing lewd or obscene statements at her.

[¶49]  Even though it is unnecessary, we will briefly address the sufficiency of the evidence showing Mr. Dugan's statements were obscene under the ordinary meaning of that term.  As we stated earlier, the ordinary meaning of obscene is "'[e]xtremely offensive under contemporary community standards of morality and decency; grossly repugnant to the generally accepted notions of what is appropriate.'" *Dougherty,* ¶ 12, 239 P.3d at 1181 (quoting *Black's Law Dictionary* 1182 (9th ed. 2009)).  Mr. Dugan wrote a virtual stranger asking about her favorite sex positions and whether she was a "moaner" or "screamer" while having sex.  He described his penis and told her he could make her have good orgasms.  He suggested dripping flavored oil on her "boobs" and "cooter" so he could lick it off.  He described his fantasy about having sex with her after taking illegal drugs.  Viewing this evidence in the light most favorable to the prosecution, the jury could have reasonably found Mr. Dugan's statements to the victim were extremely offensive and grossly repugnant.

## IV.    Admissibility of Evidence that Mr. Dugan Had Been Warned Not to Send Unsolicited Letters

[¶50]  Mr. Dugan claims the district court erred by admitting evidence that he had been told to stop sending unsolicited letters to the victim and others.  Mr. Dugan's primary complaints concern the admission of selections from a recorded interview and the testimony of Department of Corrections employee, Shawn Hobson.

[¶51]  Mr. Dugan objected to admission of the evidence.  "When an issue regarding the admissibility of evidence is presented to the district court, we review its decision for abuse of discretion."  *Swett v. State,* 2018 WY 144, ¶ 11, 431 P.3d 1135, 1140 (Wyo. 2018) (citing *Triplett v. State,* 2017 WY 148, ¶ 23, 406 P.3d 1257, 1262 (Wyo. 2017)).

> A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal. The appellant bears the burden of showing an abuse of discretion.
>
> *In re GAC,* 2017 WY 65, ¶ 32, 396 P.3d 411, 419 (Wyo. 2017) (quoting *Wise v. Ludlow,* 2015 WY 43, ¶ 42, 346 P.3d 1, 12 (Wyo. 2015)) (other citations omitted).

*Id.*

[¶52]  Mr. Dugan also claims his right to confront witnesses under the Sixth Amendment to the United States Constitution was violated when the district court admitted the evidence.  U.S. Const. Amend. 6 ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]").  We review the constitutional issue *de novo*.  *Kramer v. State,* 2012 WY 69, ¶ 18, 277 P.3d 88, 93 (Wyo. 2012).

### A. *Recorded Interview*

[¶53]  Investigator McNare testified that she and Investigative Sergeant Ben Peech interviewed Mr. Dugan at the Wyoming State Penitentiary in Rawlins on February 13, 2017.  Parts of the recorded interview were admitted into evidence at trial as Exhibit 55.  Neither party informs the Court as to the actual statements contained in Exhibit 55.  However, our review of the exhibit reveals four snippets from the interview.  The first snippet:

> [Investigator Peech].  So, when you were up in Torrington, did the uh, one of the Department of Corrections people come and talk to you?
>
> [Mr. Dugan].  Uh, a couple.
>
> Q.  What did they talk to you about, Louie?
>
> A.  To stop writing letters.
>
> Q.  Ok, stop writing letters to who?

19

A.     Whoever I'm writing letters to.

. . .

[Investigator McNare]:  [Did] they tell you specifically?

. . .

[Investigator Peech]: They said stop writing to [the victim]?

 A.     Yeah.

[Investigator Peech]:  Have you written to [the victim] after that?

A.     Yeah, I did.

Q.     How many times?

A.     Once.

Q.     Why Louie?

A.     I don't know.  Cause I was being dumb.

[Investigator McNare]:  What about another letter that she just got today?

A.     Uh, I don't know.  There was only one.

The second snippet:

[Officer McNare]: What do you expect us to do, Louie, when people keep coming to us saying that they are getting these letters from you?

A.     I guess I'll just stop.

Q.     But, you've been told, and the last time we were here, we talked to you about that.  Lieutenant Smith in Torrington talked to you about that.

. . .

The third snippet:

[Officer McNare]:  And then, how about [the victim]?

20

A.      Sent it to her work.

Q.      And, how many letters have you sent her?

A.      Well, like a couple.

Q.      A couple, as in?

A.      I don't know.

[Investigator Peech]:  So, you were recently up in Torrington, right?

A.      Yeah.

The fourth snippet:

[Investigator McNare]:  Okay, um, has [the victim]
asked you to –

A.      No.

Q.      – continue communications with her?

A.      No.  [unintelligible].

After Exhibit 55 was played for the jury, Investigator McNare testified Mr. Dugan was incarcerated at the Wyoming Medium Correctional Institution in Torrington until February 1, 2017, when he was moved to the Wyoming State Penitentiary.  She reiterated that staff at the Torrington facility told Mr. Dugan to stop writing letters.

[¶54]  Mr. Dugan claims that because the corrections officers mentioned in the questions in Exhibit 55 did not testify at trial, the questions included inadmissible hearsay and violated his constitutional right to confront the witnesses against him.  Hearsay generally is not admissible.  W.R.E. 802.  W.R.E. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion."  W.R.E. 801(a).  "Assertion" is not defined in the rules of evidence.  However, the definition of "statement" indicates there has to be an intent by the declarant to assert.  This is consistent with the definition in *Black's Law Dictionary* 143 (11th ed. 2019) which defines an "assertion" as "a declaration or allegation" or "person's speaking, writing, acting, or failing to act with the *intent of expressing a fact or opinion.*"  (emphasis added).  Questions generally "contain no assertion; they simply seek answers."  *Brown v. Commonwealth,* 487 S.E.2d 248, 251 (Va. Ct. App. 1997).  Furthermore, questions typically are not offered for the truth of the matter asserted, but as background and context for the defendant's answers.  *See, e.g,*

21

*United States v. Fernandez,* 914 F.3d 1105, 1111 (7th Cir. 2019) (citing *Estate of Moreland v. Dieter,* 395 F.3d 747, 753-54 (7th Cir. 2005)); *United States v. Levy,* 594 F.Supp.2d 427, 439-440 n.5 (D.N.Y. 2009). A question may, however, be a statement under Rule 801 if it does not actually seek information from the respondent but, instead, contains an implied assertion to establish the truth of the information contained in the question. *Brown,* 487 S.E.2d at 251.

[¶55] For the most part, the investigators' questions sought information from Mr. Dugan and had no significance without Mr. Dugan's responses. Therefore, the questions were not "statements" under Rule 801(a) and were not "hearsay" because they were not offered for the truth of the matter asserted under Rule 801(c). Mr. Dugan's responses to the questions were not hearsay because they were admissions of a party-opponent under W.R.E. 801(d)(2). The last question in the second snippet is the only one that causes us any concern, largely because it does not include Mr. Dugan's response. However, the same information, i.e., that he had been told by personnel at the Torrington facility not to write letters, was confirmed by Mr. Dugan elsewhere in the interview, so there is no prejudice from the admission of the one arguably improper statement. The same rationale applies to Investigator McNare's testimony about corrections officers telling Mr. Dugan to stop writing letters. Regardless of whether or not the investigator's statements contained hearsay, Mr. Dugan cannot show any prejudice from the jury hearing information from Investigator McNare that it already heard directly from him.

[¶56] The district court's admission of the recorded interview also did not violate Mr. Dugan's constitutional right to confront the witnesses against him under U.S. Const. Amend. 6. In *Crawford v. Washington,* 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004), the United States Supreme Court stated the Confrontation Clause generally prohibits the admission of testimonial statements when the declarant does not appear at trial for cross-examination by the defendant. The Confrontation Clause does not, however, bar statements that are offered for purposes other than the truth of the matter asserted. *Id.,* 541 U.S. at 59 n.9, 124 S.Ct. at 1369 n.9. *See also*, *Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985) (admission of a statement not offered for the truth of the matter asserted did not raise any Confrontation Clause concerns).

[¶57] As we said, the information contained in the interview questions posed to Mr. Dugan was not offered for the truth of the matter asserted. Therefore, Mr. Dugan's right to confront the declarants was not violated by admission of the questions. The evidentiary value of the recorded interview was in Mr. Dugan's responses. In that sense, he was the witness against himself, which does not implicate the Confrontation Clause.

## B. *Shawn Hobson's Testimony*

[¶58] Shawn Hobson, a correctional captain at the Wyoming State Penitentiary, testified at Mr. Dugan's trial. The prosecutor asked him if Mr. Dugan had been reprimanded for

writing letters while at the penitentiary. Defense counsel objected to his testimony as irrelevant under W.R.E. 401, unduly prejudicial under W.R.E. 403, and violating a previous order excluding, under W.R.E. 404(b), evidence of previous instances when Mr. Dugan had sent letters to unwilling recipients. His objection was apparently overruled[7] because Captain Hobson was allowed to testify that, in 2016 and 2017, Mr. Dugan had been told not to write letters to people outside the facility and disciplined for violating that directive.

[¶59] On appeal, Mr. Dugan argues the district court erred by admitting Captain Hobson's testimony without performing an analysis of whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under Rule 403. The record indicates the district court did balance the danger of unfair prejudice against the probative value of the evidence showing that Mr. Dugan was told on prior occasions not to write letters from prison. The court found the evidence was probative of Mr. Dugan's intent and the danger of unfair prejudice was slight. Mr. Dugan makes no argument that the district court erred in its balancing. Mr. Dugan also intimates that the district court misapplied Rule 404(b) or failed to follow its earlier ruling on the 404(b) evidence. However, he provides no cogent argument to support his claim, so we will not consider it. *Pier v. State,* 2019 WY 3, ¶ 26, 432 P.3d 890, 898 (Wyo. 2019) (citing *Blevins v. State,* 2017 WY 43, ¶ 22, 393 P.3d 1249, 1254 (Wyo. 2017) (refusing to consider issue not supported by cogent argument)). The district court did not abuse its discretion by allowing Captain Hobson to testify about Mr. Dugan being told not to write unwanted letters to people outside the prison and being disciplined for violating that instruction.

**CONCLUSION**

[¶60] Mr. Dugan's First Amendment right to free speech was not violated when he was prosecuted under Wyoming's criminal stalking statute, § 6-2-506, for writing obscene letters to the victim. Section 6-2-506 properly punishes harassing conduct and does not reach a substantial amount of protected speech. The ordinary meaning of obscene applies to § 6-2-506, and Mr. Dugan was not entitled to an instruction directing the jury to apply the definition of obscene applicable to pure speech. The evidence was sufficient to support the jury's conclusion that the letters were obscene under the ordinary meaning of that term.

[¶61] The district court also properly rejected Mr. Dugan's proposed instruction on his theory of defense that he was being prosecuted in violation of his First Amendment right to free speech. The proposed instruction did not correctly state the law applicable to this case. The district court was not required to have the jury delineate Mr. Dugan's means of harassing the victim, so it did not err by using a general verdict form. Finally, the district court did not abuse its discretion or violate Mr. Dugan's constitutional right to confront the

---

[7] It appears the district court ruled on the matter in an unrecorded sidebar conference.

23

witnesses against him by allowing evidence that he had previously been told not to send letters to unwilling recipients.

[¶62]  Affirmed.

**DAVIS, Chief Justice, dissenting, in which FOX, J., joins.**

[¶63]  While I concur in the majority opinion's holding that the stalking statute is facially sound, and its holding that no First Amendment theory of defense instruction should be given in a case like this, I disagree that Mr. Dugan's First Amendment rights were not implicated by the charges against him.  Our stalking statute restricts two types of speech based on content: threats and obscene statements.  To ensure that Mr. Dugan was not convicted on the basis of protected speech, the jury should have been instructed on what constitutes obscene speech outside the protection of the First Amendment.  I believe the failure to give such an instruction was reversible error, and I therefore respectfully dissent.

[¶64]  The first step in considering an as-applied constitutional challenge to a statute is to determine whether the law is content-based or content-neutral.  *Reed v. Town of Gilbert, Ariz.*, ___U.S.___, 135 S.Ct. 2218, 2228, 192 L.Ed.2d 236 (2015).  If the law is content-based, the next question is whether the law restricts speech in a constitutionally permissible way, either because it passes strict scrutiny or because the speech that it restricts is not constitutionally protected.  *See Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) (regulation of sexual expression that is indecent but not obscene subject to strict scrutiny); *see also State v. Nowacki*, 111 A.3d 911, 928 (Conn. Ct. App. 2015) (two-step process requires determination of whether harassment prosecution was based on content of speech and then whether prosecution was constitutionally permissible).

[¶65]  Given this framework for evaluating an as-applied First Amendment challenge, I will first address the majority opinion's content-neutrality determination and the reasons I view Wyoming's stalking statute as a content-based restriction on speech.  I will then turn to my next conclusion, which is that the restriction is permissible because it restricts speech that is not constitutionally protected.  Last, I will address the failure to instruct the jury on the definition of the term "obscene" and why I believe that was reversible error.

**A.    Wyo. Stat. Ann. § 6-2-506 as Content-Based Restriction on Speech**

[¶66]  As the majority opinion points out, Wyoming's stalking statute prohibits a course of conduct directed at a specific person with the intent to harass.  Conduct that is considered harassing includes non-speech conduct such as vandalism, nonconsensual physical contact, following, and surveilling. Wyo. Stat. Ann. § 6-2-506 (LexisNexis 2017).  The law also, however, defines harassing conduct to include verbal or written threats and obscene statements and images. Wyo. Stat. Ann. § 6-2-506(a)(ii).  Despite these express restrictions on two categories of speech, the majority concludes that the statute, and its application in this case, has no First Amendment implications.  I disagree.[8]

---

[8] In *Luplow*, this Court stated that the stalking statute is content-neutral.  *Luplow v. State*, 897 P.2d 463, 468 (Wyo. 1995).  It did so without analysis and in the context of addressing an overbreadth claim, a claim for

[¶67] "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468, 130 S.Ct. 1577, 1584, 176 L.Ed.2d 435 (2010) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002)). In other words, the First Amendment generally precludes content-based laws, meaning "those that target speech based on its communicative content." *Reed*, ___U.S. at ___, 135 S.Ct. at 2226. A law is content-based "if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479, 134 S.Ct. 2518, 2531, 189 L.Ed.2d 502 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984)). A law is also content-based if it is "concerned with undesirable effects that arise from 'the direct impact of speech on its audience' or 'listeners' reactions to speech.'" *McCullen*, 573 U.S. at 481, 134 S.Ct. at 2531-32 (quoting *Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)); *see also Operation Save America v. City of Jackson*, 2012 WY 51, ¶ 71, 275 P.3d 438, 459 (Wyo. 2012) ("A restriction that seeks to protect or shield an audience from disturbing or distressing aspects of speech is content-based.").

[¶68] Wyoming's stalking statute restricts two types of speech, one based on its threatening content and the other based on its obscene content. Plainly, in the event of a stalking allegation based on threatening or obscene speech, law enforcement will be required to consider the content of the speech to determine if it fits the alleged category. Indeed, the majority acknowledges as much at ¶ 25 when it explains that the stalking statute required the State to prove that the content of Mr. Dugan's speech was obscene or threatening to obtain a conviction. Additionally, the statute requires an intent to cause the victim substantial emotional distress, meaning that it looks to the effect of the speech on the person to whom it is directed. It seems clear to me then that Wyoming's stalking statute is a content-based restriction on speech. *See State v. Shackelford*, 825 S.E.2d 689, 699 (N.C. Ct. App. 2019) (stalking statute content based because determination that defendant knew or should have known statements would cause a reasonable person to suffer emotional distress cannot be made without reference to content); *People v. Relerford*, 104 N.E.3d 341, 350 (Ill. 2017) (stalking statute content based because it looks to listener's reaction and cannot be justified without reference to content); *State v. Moulton*, 78 A.3d 55, 71 (Conn. 2013) (where jury must consider caller's speech to determine whether call was alarming or harassing First Amendment is implicated).

[¶69] The majority opinion concludes otherwise, holding that because the stalking statute requires a course of conduct and specific intent to harass, it is not a content-based restriction

which such a determination was not necessary. Under such circumstances, the statement is dictum and not binding. *See In Interest of DJS-Y*, 2017 WY 54, ¶ 9, 394 P.3d 467, 470 (Wyo. 2017) (statement in prior case not essential to decision categorized as dictum that "lacks the force of an adjudication").

on speech. *See supra* ¶ 22. I again disagree. While course of conduct and specific intent may insulate a stalking statute from an overbreadth challenge, they are not the factors that the Supreme Court uses or that this Court has relied on to determine content neutrality. *McCullen*, 573 U.S. at 479, 481, 134 S.Ct. at 2531-32; *Operation Save America*, ¶ 71, 275 P.3d at 459. Nor do I read the authorities on which the majority relies to support such an approach.[9]

[¶70] The first case on which the majority relies is *People v. Kucharski*, 987 N.E.2d 906, 914 (Ill. Ct. App. 2013). *Kucharski* addressed the constitutionality of an Illinois harassment statute that prohibited obscene electronic communications with an intent to offend. *Id*. The defendant in that case acknowledged that the term "obscene," as used in the statute, referred to an unprotected type of speech, but he argued that because the statute carved out a subset of obscene language, that being obscene language with the intent to offend, the statute had created an unconstitutional content-based restriction. *Id*. The Illinois court rejected the argument.

> In so arguing, the defendant relies on *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 383–84, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), in which the Supreme Court stated:
>
>> "[A]reas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content. Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing only libel critical of the government." (Emphases in original and omitted.)

---

[9] In addition to citing the statute's course of conduct and specific intent to harass as factors in its content neutrality holding, the majority opinion states, "The fact that § 6-2-506 identifies 'lewd or obscene statements' in the definition of harass does not make it a content-based regulation on speech rather than a regulation of conduct without a significant impact on protected speech." *See supra* ¶ 22. To the extent the majority is suggesting that the First Amendment is not implicated if a law is not a full ban on speech, I disagree. The Supreme Court has held:

> It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.

*United States v. Playboy Entm't Grp.*, 529 U.S. 803, 812, 120 S.Ct. 1878, 1886, 146 L.Ed.2d 865 (2000).

Based on the foregoing, the defendant reasons that, although it is constitutionally permissible to criminalize obscene speech, it is not permissible to criminalize only obscene speech that is intended to offend another person.

We find the defendant's argument and reliance on *R.A.V.* unpersuasive. The *R.A.V.* court went on to explain:

> "The concurrences describe us as setting forth a new First Amendment principle that prohibition of constitutionally proscribable speech cannot be 'underinclusiv[e],' * * * [i.e., that] 'a government must either proscribe all speech or no speech at all' * * *. That easy target is of the concurrences' own invention. In our view, the First Amendment imposes not an 'underinclusiveness' limitation but a 'content discrimination' limitation upon a State's prohibition of proscribable speech." (Emphasis omitted.) *Id.* at 387, 112 S.Ct. 2538.

In the present case, criminalizing only obscene communication that is made with "an intent to offend" does not amount to content-based discrimination but, rather, is an attempt to regulate the *conduct* that accompanies the proscribed speech. "Speech may not be proscribed because of the ideas it expresses, but it may be restricted because of the manner in which it is communicated or the action that it entails." *Bergman v. District of Columbia*, 986 A.2d 1208, 1220 (D.C. 2010) (citing *R.A.V.*, 505 U.S. at 385, 112 S.Ct. 2538). In other words, speech may be restricted when it "embodies a particular intolerable (and socially unnecessary) *mode* of expressing whatever idea the speaker wishes to convey." (Emphases in original and omitted.) *R.A.V.*, 505 U.S. at 393, 112 S.Ct. 2538. Here, an obscene electronic communication made with "an intent to offend" is restricted by the statute not because its content communicates any particular idea; rather, it is restricted because of the purpose for which it is communicated. Accordingly, there is no content-based discrimination and the defendant's constitutional argument necessarily fails.

*Kucharski*, 987 N.E.2d at 913-14.

28

[¶71]  I do not believe that *Kucharski* stands for the proposition that an "intent to offend" requirement shields a statute from a First Amendment challenge.  The court merely rejected the idea that criminalizing the unprotected speech based on an intent to offend somehow added a content-based qualifier that transformed a restriction on unprotected speech into one based on protected content.  Were the appellate court intending otherwise, its holding would run counter to Illinois precedent.  The Illinois Supreme Court follows the same United States Supreme Court approach I cited above, and it in fact did so in finding that state's stalking statute to be content-based.

> Of relevance here, the proscription against "communicat[ions] to or about" a person that negligently would cause a reasonable person to suffer emotional distress criminalizes certain types of speech ***based on the impact that the communication has on the recipient***. ***Under the relevant statutory language, communications that are pleasing to the recipient due to their nature or substance are not prohibited, but communications that the speaker "knows or should know" are distressing due to their nature or substance are prohibited***. Therefore, it is clear that the challenged statutory provision must be considered a content-based restriction because it cannot be justified without reference to the content of the prohibited communications. *See Reed*, 576 U.S. at ——, 135 S.Ct. at 2227; *see also Matal v. Tam*, 582 U.S. ——, ——, 137 S.Ct. 1744, 1764–65, 198 L.Ed.2d 366 (2017) (plurality opinion) (holding that the "disparagement clause," which prohibits federal registration of a trademark based on its offensive content, violates the first amendment).

*Relerford*, 104 N.E.3d at 350 (emphasis added).

[¶72]  The next two cases on which the majority relies to support its content-neutrality conclusion are *Perkins v. Commonwealth*, 402 S.E.2d 229 (Va. Ct. App. 1991), and *State v. Richards*, 896 P.2d 357 (Idaho 1995).  Both decisions addressed overbreadth challenges to harassment statutes, and each court held no more than that the challenged statutes' course of conduct and specific intent elements defeated the overbreadth claim.  Neither decision addressed content neutrality.

[¶73]  The final case on which the majority relies is *State v. Dugan*, 303 P.3d 755 (Mont. 2013).  In that case, the Montana Supreme Court held:

> Montana's Privacy in Communications statute legitimately encompasses only those electronic communications made with the purpose to terrify, intimidate, threaten, harass, annoy, or

29

offend. Such communications can be proscribed without violating the Montana and United States Constitutions.

*Dugan*, 303 P.3d at 772.

[¶74]  The Montana court made this statement at the conclusion of an overbreadth analysis. To the extent that its holding is that the specific-intent requirement is a factor that will undermine an overbreadth claim, I have no quarrel with that, and notably, the decision does not discuss content neutrality or attempt to link the question of content neutrality to the statement.  Beyond that context, I do not believe the statement can be relied on to support the broad proposition that statutory requirements of course of conduct and specific intent preclude a First Amendment challenge.  Such a proposition simply finds no support in United States Supreme Court precedent.

[¶75]  For example, in *R.A.V.*, the petitioner burned a cross in the yard of a black family and was charged under a St. Paul, Minnesota ordinance that provided:

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 380, 112 S.Ct. 2538, 2541, 120 L.Ed.2d 305 (1992).

[¶76]  The Court held that the ordinance violated the First Amendment because it was a content-based restriction on expression that could not survive strict scrutiny.  *R.A.V.*, 505 U.S. at 396, 112 S.Ct. at 2550.  I cite this decision not for its constitutional analysis of the ordinance, but because the Court was presented with an ordinance that had elements of conduct and intent, and those factors did not stop the Court from considering whether the restriction violated the First Amendment.

[¶77] Federal cases considering challenges to the federal stalking statute are also illustrative.  The federal stalking statute does not expressly restrict speech, and because of its focus on conduct, federal courts have rejected overbreadth challenges to the statute.[10]

---

[10] In *United States v. Ackell*, 907 F.3d 67, 72 (1st Cir. 2018) (footnote omitted), the court quoted the statute and described it as follows:

> As is relevant here, § 2261A(2)(B) penalizes whoever:

*Ackell*, 907 F.3d at 77; *United States v. Gonzalez*, 905 F.3d 165, 190 n.10 (3rd Cir. 2018); *United States v. Osinger*, 753 F.3d 939, 944 (9th Cir. 2014); *United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012). The same courts have also recognized, however, that the federal statute may be enforced in an unconstitutional manner. For example, the *Ackell* court observed:

> Ultimately—while acknowledging that § 2261A(2)(B) could have an unconstitutional application, and remaining cognizant of the chilling-effect-related concerns inherent in declining to invalidate a statute that can be applied to violate the First Amendment—we are unconvinced that we must administer the "strong medicine" of holding the statute facially overbroad. *See Williams*, 553 U.S. at 293, 128 S.Ct. 1830 (quoting *L.A. Police Dep't v. United Report Publ'g Corp.*, 528 U.S. 32, 39, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999)). The statute does not, on its face, regulate protected speech, or conduct that is necessarily intertwined with speech or expression. Should situations arise where the statute is applied to courses of conduct that are sufficiently expressive to implicate the First Amendment, we are confident that as-applied challenges will properly safeguard the rights that the First Amendment enshrines.

*Ackell*, 907 F.3d at 77 (footnote omitted); *see also Osinger*, 753 F.3d at 944; *Petrovic*, 701 F.3d at 856.

---

> with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that ... causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to [that] person [or an immediate family member, spouse, or intimate partner of that person.]

Hence, to properly secure a conviction under § 2261A(2)(B), the prosecution must prove that: (1) the defendant had the requisite intent; (2) the defendant "engage[d] in a course of conduct"; (3) the defendant used a facility of interstate commerce; and (4) the defendant's "course of conduct" "cause[d], attempt[ed] to cause, or would be reasonably expected to cause substantial emotional distress." A "course of conduct" is "a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2).

[¶78]  These federal cases show that even where a stalking law is expressly aimed only at conduct, the potential exists for enforcement that may run afoul of the First Amendment. It thus seems untenable to me that we would hold that Mr. Dugan's as-applied challenge to the Wyoming law must fail because of our law's course-of-conduct and intent requirements.  Wyoming's stalking statute expressly restricts speech based on its content, and in my view, we must take the next step and determine whether its restrictions are constitutionally permissible.

**B.      Constitutionality of Wyo. Stat. Ann. § 6-2-506's Restrictions on Speech**

[¶79]  The stalking statute's restrictions on speech are content based and therefore subject to strict scrutiny, meaning that to be found constitutional, the State must prove that they are narrowly tailored to promote a compelling government interest. *Playboy Entm't Grp.*, 529 U.S. at 813, 120 S.Ct. at 1886. For example, in *Shackelford*, a North Carolina appellate court considered an as-applied challenge to a felony stalking statute and concluded that prosecution of the defendant was not the least restrictive means of promoting the State's interest.

> Here, the State contends that the application of N.C. Gen. Stat. § 14-277.3A to Defendant's Google Plus posts is sufficient to withstand strict scrutiny because (1) the prevention of stalking "before it escalates into more harmful or lethal criminal behavior" is a compelling state interest; and (2) the statute is the least restrictive means of accomplishing this goal in that it "is limited to willful or knowing conduct, directed at a specific person, that would cause a reasonable person to suffer fear or substantial emotional distress." However, even assuming *arguendo* that the statute serves a compelling governmental interest in preventing the escalation of stalking into more dangerous behavior, we are not persuaded that the application of N.C. Gen. Stat. § 14-277.3A to Defendant's posts represented the least restrictive means of accomplishing that goal.
>
> Prior to Defendant's indictments, Mary had already sought and received a no-contact order in district court that prohibited him from approaching or contacting her. Given the existence of a no-contact order against Defendant, strict enforcement of the terms of that order clearly represented a less restrictive means by which the State could have pursued its interest in preventing Defendant from engaging in a criminal act against her.

32

*Shackelford*, 825 S.E.2d at 700.

[¶80]  On the other hand, a strict scrutiny analysis is not required if the speech at issue is not constitutionally protected.  *Stevens*, 559 U.S. at 468-69, 130 S.Ct. at 1584.  The categories of unprotected speech are "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."  *Id*. (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)).  Included among the categories of unprotected speech are threats and obscene speech.  *Stevens*, 559 U.S. at 468, 130 S.Ct. at 1584..

[¶81]  The Supreme Court has defined an unprotected threat to mean a "true threat."

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *See Watts v. United States*, *supra*, at 708, 89 S.Ct. 1399 ("political hyberbole" is not a true threat); *R.A.V. v. City of St. Paul*, 505 U.S., at 388, 112 S.Ct. 2538. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." *Ibid*. Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Virgina v. Black*, 538 U.S. 343, 359-60, 123 S.Ct. 1536, 1548, 155 L.Ed.2d 535 (2003).

[¶82]  With respect to obscene speech, which the Supreme Court has also historically referred to as "lewd and obscene" speech, *Miller v. California*, 413 U.S. 15, 20, 93 S.Ct. 2607, 2613, 37 L.Ed.2d 419 (1973) (quoting *Chaplinsky*, 315 U.S. at 571-72, 62 S.Ct. at 768-69), the term obscene is defined according to a set of guidelines:

> The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest, *Kois v. Wisconsin*, *supra*, 408 U.S., at 230, 92 S.Ct., at 2246, quoting *Roth v. United States*, *supra*, 354 U.S., at 489, 77 S.Ct., at 1311; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

(c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller*, 413 U.S. at 24-25, 93 S.Ct. at 2614-15.

[¶83]  The Court expanded on how part (b) of its standard might be applied in practice with "a few plain examples."

> (a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.
>
> (b) Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

*Miller*, 413 U.S. at 25, 93 S.Ct. at 2615.[11]

[¶84]  I do not believe that it is necessary to resort to a strict scrutiny analysis to resolve Mr. Dugan's as-applied challenge.  In my view, the legislature intended to criminalize only speech that is not constitutionally protected, and when it called out verbal or written threats and obscene statements and images as restricted speech under the statute, it meant as those terms are defined to fall outside constitutional protections.

[¶85] I come to this conclusion through the application of our rules of statutory interpretation.

> "When we interpret statutes, our goal is to give effect to the intent of the legislature, and we 'attempt to determine the legislature's intent based primarily on the plain and ordinary meaning of the words used in the statute.'" *Fugle v. Sublette County School Dist. No. 9*, 2015 WY 98, ¶ 8, 353 P.3d 732, 734 (Wyo. 2015) (quoting *Krenning v. Heart Mountain Irrigation Dist.*, 2009 WY 11, ¶ 9, 200 P.3d 774, 778 (Wyo. 2009)). "Where legislative intent is discernible a court should give effect to the 'most likely, most reasonable, interpretation of the statute, given its design and purpose.'" *Adekale v. State*, 2015 WY 30, ¶ 12, 344 P.3d 761, 765 (Wyo. 2015) (quoting *Rodriguez v. Casey*, 2002 WY 111, ¶ 20, 50 P.3d 323, 329 (Wyo. 2002)).

---

[11] Wyoming's statute defining the crime of promoting obscenity incorporates the *Miller* guidelines and these examples to define the term "obscene" for purposes of that statute.  Wyo. Stat. Ann. § 6-4-301(a)(iii), (v) (LexisNexis 2019).

34

We therefore construe each statutory provision *in pari materia*, giving effect to every word, clause, and sentence according to their arrangement and connection. To ascertain the meaning of a given law, we also consider all statutes relating to the same subject or having the same general purpose and strive to interpret them harmoniously. We presume that the legislature has acted in a thoughtful and rational manner with full knowledge of existing law, and that it intended new statutory provisions to be read in harmony with existing law and as part of an overall and uniform system of jurisprudence. When the words used convey a specific and obvious meaning, we need not go farther and engage in statutory construction.

*PacifiCorp, Inc. v. Wyo. Dep't of Revenue*, 2017 WY 106, ¶ 10, 401 P.3d 905, 908-09 (Wyo. 2017) (quoting *Nicodemus v. Lampert*, 2014 WY 135, ¶ 13, 336 P.3d 671, 674 (Wyo. 2014)).

*Sullivan v. State*, 2019 WY 71, ¶ 10, 444 P.3d 1257, 1259-60 (Wyo. 2019) (quoting *Wyo. Jet Center, LLC v. Jackson Hole Airport Bd.*, 2019 WY 6, ¶ 12, 432 P.3d 910, 915 (Wyo. 2019)).

[¶86]   As the majority opinion observes, when Wyoming's stalking statute was originally enacted, the only type of speech it restricted based on content was threatening speech. *See supra* ¶ 11 n.3.  The restriction on lewd or obscene statements was added in 2007, but before that, this Court decided *Luplow*.  In *Luplow*, the Court observed that the statute had been written to avoid infringing on constitutionally protected conduct and that "[i]t is true it may inhibit speech, but only in a constitutionally permissible way."  *Luplow*, 897 P.2d at 467; *see also McCone v. State*, 866 P.2d 740, 745-46 (Wyo. 1993) (interpreting Wyoming's terroristic threat statute to apply to constitutionally unprotected speech).  This was the backdrop against which the legislature added obscene speech as a second category of speech restricted based on its content.  We presume the legislature acts with full knowledge of existing law, and with this Court signaling that these types of statutes may restrict speech in only a constitutionally permissible way, it is unsurprising that the 2007 amendment added another category of speech that had historically been treated as constitutionally unprotected.  I believe the legislature intended that the statute impose content-based restrictions only on unprotected speech and that the restricted categories of speech would be so defined.

[¶87] This interpretation of the stalking statute is consistent with our presumption of constitutionality.  *See Sheesley v. State*, 2019 WY 32, ¶ 3, 437 P.3d 830, 833 (Wyo. 2019)

35

("Statutes are presumed constitutional, and we resolve any doubt in favor of constitutionality."). As a practical matter, it is also consistent with the specific intent at which the statute is aimed. As the Supreme Court has observed, "most situations where the State has a justifiable interest in regulating speech will fall within one or more of the various established exceptions" to protected speech. *Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971). In other words, if the speech is a "true threat," or obscene as defined by *Miller*, the intent to harass will likely be self-evident.[12]

## C.     Failure to Instruct the Jury on the *Miller* Definition of Obscene

[¶88]   We review a district court's decision on jury instructions for an abuse of discretion. *Schmuck v. State*, 2017 WY 140, ¶ 45, 406 P.3d 286, 301 (Wyo. 2017).

> District courts have wide latitude in instructing the jury and, as long as the instructions correctly state the law and the entire charge covers the relevant issue, reversible error will not be found. An incorrect ruling on an instruction must be prejudicial to constitute reversible error. Because the purpose of jury instructions is to provide guidance on the applicable law, prejudice will result when the instructions confuse or mislead the jury.

*Id.* (quoting *Hurley v. State*, 2017 WY 95, ¶ 8, 401 P.3d 827, 830 (Wyo. 2017)).

[¶89]   We have also said:

> The purpose of jury instructions is to "provide the jury with a foundational legal understanding to enable a reasoned application of the facts to the law." *Walker v. State*, 2013 WY 58, ¶ 31, 302 P.3d 182, 191 (Wyo.2013). In order to support a

---

[12] The majority opts for a different definition of obscene, drawing on the plain meaning we gave the term in *Dougherty v. State*, 2010 WY 127, ¶ 12, 239 P.3d 1176, 1181 (quoting *Black's Law Dictionary* 1182 (9th ed. 2009)): "[e]xtremely offensive under contemporary community standards of morality and decency; grossly repugnant to the generally accepted notions of what is appropriate." Interestingly, the same *Black's Law Dictionary* definition goes on to provide the *Miller* definition for purposes of First Amendment considerations. The *Dougherty* court had no need to incorporate that part of the definition into its analysis because the case before it did not involve speech or expression and concerned only a charge relating to sexual conduct in the presence of a minor. For First Amendment purposes, I believe the *Dougherty* definition falls short of being sufficiently protective. *See Ashcroft v. ACLU*, 535 U.S. 564, 574, 122 S.Ct. 1700, 1707, 152 L.Ed.2d 771 (2002) (noting the Court's multi-year struggle to define obscenity in a manner that did not impose impermissible burden on protected speech); *Reno v. ACLU*, 521 U.S. 844, 874, 117 S.Ct. 2329, 2346, 138 L.Ed.2d 874 (1997) (quoting *Sable*, 492 U.S., at 126, 109 S.Ct., at 2836) ("In evaluating the free speech rights of adults, we have made it perfectly clear that '[s]exual expression which is indecent but not obscene is protected by the First Amendment.'").

reliable verdict, it is crucial that the trial court correctly state the law and adequately cover the relevant issues. *Id*. Ultimately, the test of adequate jury instructions is "whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed." *Id*. (quoting *Burnett v. State*, 2011 WY 169, ¶ 14, 267 P.3d 1083, 1087 (Wyo.2011)).

*Wilkerson v. State*, 2014 WY 136, ¶ 25, 336 P.3d 1188, 1199 (Wyo. 2014).

[¶90]   In *Miller*, the Supreme Court recognized that a jury would likely be making the determination of whether restricted speech was obscene, and it noted the need to provide it guidance in performing that function.

When triers of fact are asked to decide whether "the average person, applying contemporary community standards" would consider certain materials "prurient," it would be unrealistic to require that the answer be based on some abstract formulation. The adversary system, with lay jurors as the usual ultimate factfinders in criminal prosecutions, has historically permitted triers of fact to draw on the standards of their community, ***guided always by limiting instructions on the law***.

*Miller*, 413 U.S. at 30, 93 S.Ct. at 2618 (emphasis added); *see also Jenkins v. Georgia*, 418 U.S. 153, 160, 94 S.Ct. 2750, 2755, 41 L.Ed.2d 642 (1974) ("Even though questions of appeal to the 'prurient interest' or of patent offensiveness are 'essentially questions of fact,' it would be a serious misreading of *Miller* to conclude that juries have unbridled discretion in determining what is 'patently offensive.'").

[¶91]   The *Miller* definition of obscene is protective of First Amendment rights and is not the type of intuitive definition we can legitimately expect the jury to bring to its fact-finding task without guidance.  Absent a proper instruction, the jury is left to apply its own personal views of what may constitute obscene writings, and in a close case, I do not believe that we can be ensured of a reliable verdict that does not convict on the basis of protected speech.  As the Connecticut Supreme Court observed:

We therefore agree with the state that § 53a–183 (a) proscribes harassing and alarming speech as well as conduct. We further conclude that, in order to ensure that a prosecution under that provision does not run afoul of the first amendment, the court must instruct the jury on the difference between protected and unprotected speech whenever the state relies on the content of

37

a communication as substantive evidence of a violation of § 53a–183 (a).

*State v. Moulton*, 78 A.3d 55, 71-72 (Conn. 2013) (footnote omitted); *see also Commonwealth v. Bigelow*, 59 N.E.3d 1105, 1119 (Mass. 2016) ("[T]he failure to instruct the jury that where the complaint is based on incidents of pure speech, they must find the defendant's challenged speech constituted a true threat—and therefore was constitutionally unprotected speech—created a substantial risk of a miscarriage of justice."); *Barson v. Commonwealth*, 726 S.E.2d 292, 296 (Va. 2012) (legislature intended *Miller* definition to apply to term "obscene" in harassment statute, and it was therefore reversible error to instruct jury with dictionary definition); *State v. Schaler*, 236 P.3d 858, 860 (Wash. 2010) (en banc) (harassment statute must be read to proscribe only true threats, and jury must be so instructed); *State v. Perkins*, 626 N.W.2d 762, 773 (Wis. 2001) ("The danger in this case is that the instruction gave the jury no definition of the essential element of a 'threat' and that the jury may have used the common definition of 'threat,' thereby violating the defendant's constitutional right to freedom of speech.").

[¶92]   The evidence on the obscenity of Mr. Dugan's letters was far from overwhelming. Over the course of a couple of weeks, he wrote the victim ten letters, with the first four arriving in a single mailing.  The letters totaled thirty-eight pages and contained a handful of sexual comments and requests scattered throughout.  I believe that in this case there is every chance that the jury convicted Mr. Dugan on the basis that his writings were merely indecent.  *See Sable*, 492 U.S. at 126, 109 S.Ct. at 2836 ("Sexual expression which is indecent but not obscene is protected by the First Amendment").  At the very least a fair probability exists that the verdict would have been different had the jury been instructed to consider the writings as whole and according to the *Miller* guidelines.  I would therefore reverse Mr. Dugan's conviction and remand for a new trial.[13]

---

[13] I believe that there is very little chance that the jury convicted Mr. Dugan on the basis that his letters were threatening, which probably accounts for the State's decision to argue only the evidence on obscenity in response to Mr. Dugan's sufficiency of the evidence challenge. The letters simply contained no threats, as the victim's testimony confirmed.

> Q.      So the worst thing that Mr. Dugan did was ask you for a relationship?
>
> A.      And he said he would come visit me at my house.
>
> Q.      Well, did he ever say he was going to come visit you at your house whether you liked it or not?
>
> A.      No.

Q.      Okay. And, in fact, in his request for a relationship, he often would, you know, practically beg, wouldn't he? Like say please, please, please a lot and –

A.      I don't remember the exact wording, but yes, I suppose that's –

Q.      The begging is kind of pathetic; right?

A.      Yes.

* * * *

Q.      Okay. While you were offended by the sexual content in the letter, did Lewis at any point in the letter specifically state he was going to do something physically to you against your will?

A.      No.

Q.      Okay. Did Lewis ever specifically make threats to physically harm you?

A.      No.

Q.      Okay. Lewis ever make specific threats that he was going to have sex with you against your will?

A.      No.

Q.      Did he ever make a threat that he was going to make you his girlfriend whether you liked it or not?

A.      No.

* * * *

Q.      And again, he pretty much – was pretty much begging, regarding all of his requests to visit you at your house, to have a relationship with you? He pretty much adopted a begging tone. Would that be fair to say?

A.      Yes.

While I do not discount the alarm that may be felt by the recipient of multiple unwanted communications, such alarm is not the type of threat that falls outside First Amendment protections. I also do not intend to suggest that Mr. Dugan has a right to send unwanted communications to the victim. The stalking statute criminalizes speech and has constitutional implications. A victim may nonetheless obtain a protection order, and willful violation of such an order may be punished criminally Wyo. Stat. Ann. §§ 7-3-508, 509 (setting forth the procedure for obtaining a civil order of protection), and § 7-3-510(c) (willful violation of a temporary or permanent order of protection punishable by $750 fine and imprisonment up to six months). As the Supreme Court has observed:

39

The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases. It is an aspect of the broader "right to be let alone" that one of our wisest Justices characterized as "the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). . . .

> "How far may men go in persuasion and communication and still not violate the right of those whom they would influence? In going to and from work, men have a right to as free a passage without obstruction as the streets afford, consistent with the right of others to enjoy the same privilege. We are a social people and the accosting by one of another in an inoffensive way and an offer by one to communicate and discuss information with a view to influencing the other's action are not regarded as aggression or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free, and his employer has a right to have him free." *American Steel Foundries v. Tri–City Central Trades Council*, 257 U.S. 184, 204, 42 S.Ct. 72, 66 L.Ed. 189 (1921).

We have since recognized that the "right to persuade" discussed in that case is protected by the First Amendment, *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), as well as by federal statutes. Yet we have continued to maintain that "no one has a right to press even 'good' ideas on an unwilling recipient." *Rowan*, 397 U.S., at 738, 90 S.Ct. 1484. None of our decisions has minimized the enduring importance of "a right to be free" from persistent "importunity, following and dogging" after an offer to communicate has been declined. While the freedom to communicate is substantial, "the right of every person 'to be let alone' must be placed in the scales with the right of others to communicate." *Id.*, at 736, 90 S.Ct. 1484.

*Hill v. Colorado*, 530 U.S. 703, 716-18, 120 S.Ct. 2480, 2489-90, 147 L.Ed.2d 597 (2000) (footnote omitted).

40